We turn now to the second case of the morning, Appeal No. 24-1557, U.S. v. Mark Sorensen. And we welcome Ms. Kasanick to the podium. Good morning, your honors, and may it please the court. This court should vacate defendant Mark Sorensen's conviction. The government's theory at trial was that Mr. Sorensen bought doctor's orders. So its entire closing argument was premised on this notion that by contracting with marketers indirectly that he was buying referrals. Even accepting all of the government's evidence and all reasonable inferences from it as true, he did not buy doctor's orders. This is an unusual case where there actually are not all that many disputed facts. So the government and Mr. Sorensen agree that Mr. Sorensen's company, PacMed, acted as a Medicare biller for a manufacturer of orthopedic braces. The manufacturer obtained customers via paid marketing. The marketers advertised for braces, and when a customer responded, the marketer assisted the patient in obtaining a prescription from the patient's doctor with the patient's permission. Every single case in which this court has affirmed a conviction under the anti-kickback statute has involved a defendant intending to influence a payee who served as a gatekeeper to patient care, like in Patel, or in a position of trust with access to patient or doctor, like in Paulin and in George. And the marketers here were neither. Can I ask you, Ms. Kostanek, and I'll just try to put this in a larger context if I may. I understand the idea that suppliers cannot pay doctors for referring patients to a particular product or hospital or nursing home and so on. That seems to be the core of the statute. We have a handful of cases, at least as I read them, where we have, where courts, prosecutors in courts have gone beyond doctors, in effect, health care providers. You mentioned, well, you were about to mention George, I suppose, and then our, and I'm suddenly and so on. Those seem to be pretty few and far between, and as near as I can tell in all of them, the defendant had pretty much de facto control over the, not legal control, but a lot of influence. It seems to me the best fact for you in this case is that for one of the advertisers, 80% of the doctors did not return the prescriptions. The other one, they often did not, which suggests that there wasn't actually that much control. I guess my problem is, what would this case look like if 100% of the doctors were returning those blank prescription forms with signatures? I think that there's a couple of different components of your question. To answer the last part of it directly, I don't think it would matter. It is a good fact that the doctors were returning only a minor percentage, but what I think is actually the most significant fact is that the marketers here were essentially performing an administrative task. They advertised, they placed an advertisement, the patient responded, the patient voluntarily provided information about themselves and about their doctor. The doctors were not somehow on staff for the call center. They weren't telemarketing doctors who were being paid by the marketers. Instead, it's actually no different than I ordered contacts from my dad from 1-800-CONTACTS a few weeks ago. I gave information about his eye doctor, and then 1-800-CONTACTS did the work of contacting the doctor in order to authorize the prescription. Those are administrative tasks that are handled by the marketer that were facilitated in exchange for payment in this case. Your point about Pollen and George and how they're pushing the boundaries, one really significant thing about this court's case law is that there hasn't been an opportunity to address the boundaries of where marketing and advertising turn into kickbacks. That's because, as far as I'm aware, there haven't been prosecutions in this circuit of this nature. There have been in the Fifth Circuit, and the Fifth Circuit, therefore, has had the opportunity to say, no, here are those boundaries. That's why we rely upon the Fifth Circuit case law, including Marchetti, where the court has had that opportunity to distinguish between licit and illicit activity. In this circuit, by contrast, Pollen and George are interesting cases, but the arguments there were incredibly narrow. The only legal arguments that came up to this court for this court's decision in those cases is, can the payee be someone other than a doctor? In Pollen, that was teed up very directly. The position was, the payee has to be a doctor, and this court said, no, there are lay people that can act as reviewers. That was the sales rep. Yes, Your Honor, the sales rep, which was a very unusual case, because in 14 years, never overruled by a doctor. Something strange is going on there. There's also a line in the opinion that reflects that that sales rep had a close enough relationship with patients that they were handling follow-up with CVS on behalf of the patients directly. It took on that position of being like Vernon, where they're a patient advocate. They're more than a sales rep in that situation, and the court found that to be significant. In George, the argument was similar. The payee has to be a doctor, or because the doctor had to authorize the care in George, therefore the person that was sending the referrals based on her prior conduct or relationship with patients as a home health care rep couldn't qualify, and this court said no. We recognize that that made the jury instruction here that was proposed by the defense not quite right, but it doesn't speak to whether this kind of more administrative role that was being played by the marketers here should qualify. Yes, Your Honor. Help me understand Sorenson's comments to the FBI about what he thought was illegal, his behavior, et cetera, and place that in context with what you are arguing now about his behavior. Yes, thank you for that question, because I think that this is a really important point and one that the government kind of talks in circles about. So what he said to the FBI, he was asked, did you buy doctor's orders? And he said no, and that's the same place where we just started our argument. His arrangement, in his view, was not buying doctor's orders. He had essentially a joint enterprise with a manufacturer where Simon and Pacman worked together to supply these manufactured braces. They had an agreement with marketers where marketers were paid to conduct the advertising and then to run the call center where they obtained information from patients. In his view, that's not buying doctor's orders, and in the government's view, it's only inculpatory if you agree with the government's version of the law here. I think that that addresses most of the comments that he was making to the agents. Go to his comments about the flat rate and the percentage. I mean, there is a lot of confusion throughout this trial record about percentage versus hours. Yes, Your Honor. And I think, so with respect to his statements about those, he has never asked about his payments to Pacman specifically or to the specific marketers in question. He's asked, did you pay marketers on a percentage basis? He said no. That's correct. He was paying Pacman, and Pacman was arranging with marketers to engage in this advertising conduct. So I don't think that those statements are incorrect, or if they are incorrect, it's not sufficient to establish the illegality or to remedy what this legal defect is as to whether the person, the marketers, are making the referrals in question. If we were to reverse on sufficiency of the evidence, Ms. Kostanek, what do you think an opinion should say about the applicable rule? I think that it should say that a referral requires, let me get what I think that the definition of referral should be based on this court's case law. I think it means to make a decision about care or to influence, exercise influence over a person making such a decision. Just influence? And we're into some pretty fine wordsmithing here. Yes. I actually think that maybe it should say improper influence, because that's part of the argument here.  But how do we recognize that, then? Yeah, and maybe that's a jury question, whether it's improper. But here, that is one of the problems with the jury instruction, is it defined referral as any act that directs. And of course, it's not any act that directs. Google advertising, paying Google to put your advertisements up for a health care business, that's an act that directs. It nudges somebody towards a result. A billboard, a magazine ad, a social media post, all of those are acts that direct or potentially influences a health care decision, but only in the most benign and trivial of ways. And we think that to accept that that's a referral in this situation leaves the statute without any limits. To your Honor's point about if you were to decide an insufficiency of the evidence, I think we want to make something clear from our brief, we set this up in a way to give the court alternatives in terms of remedy. All of these arguments essentially boil down to the same thing, which is the government's pushing of the boundaries of this statute. So we think that it manifested in a conviction that doesn't have a valid legal theory. We think it manifested in instructions to the jury where all of this interesting discussion wasn't presented to the jury as things that they needed to decide, and we think it manifested in the introduction of evidence that supported the government's legal theory in the form of improper lay opinion about an attorney's advice to Percanti. So whether it's vacating the opinion or a retrial, we think that you ultimately can get there in any of those ways. Well, there are procedural problems with some of those theories, as you recognize. Yes, Your Honor, we do recognize. What is Mr. Sorenson's, is he in custody now? He is on bond pending appeal with the government's agreement. Okay, thank you. If I can address Your Honor's expressed concern about the procedural issues. We do not think that there is a forfeiture issue with respect to the Rule 29 argument. We recognize that the... I don't either, but on the jury instruction, the definition, as I understand it, for referral was a jointly agreed instruction, and the defendant's alternative proposal was clearly incorrect. Yes. So that's a problem. And then the testimony about Percanti's lawyer sure looks to me like an invited error, given the exchange where the defense lawyer says, it's going to come in on cross-examination. So, agreed on the instruction insofar as I think that it would be difficult to say that that should be reviewed for anything but plain error. Insofar as the definition that was provided and agreed by defense counsel was not quite correct. On the testimony, on Percanti's testimony, I don't agree with that. What Sorenson's attorneys anticipated would be presented is the information as relayed to Sorenson by Percanti. And that is so limited. It consists of Sorenson being told by Percanti, this contract is not good. The contract wasn't good. There were problems with it. There was a supply issue with respect to whether Sorenson was complying with the supplier regulations that are set forth and require him to have a separate contract and have all the supplies on site. So, you know, that not good comment is not reflective of this. What Sorenson's attorneys never agreed to happen is for Percanti to get up there and testify about an out-of-court conversation with his attorney that opined on the ultimate issue in this case. I mean, I'm not aware of any case in which this court has ever said something like that is okay. So, it's hearsay. It's incredibly prejudicial. The limiting instruction wasn't given until six days later. And, you know, I think that the impact of hearing a lawyer testify that this conduct, that what the jury is going to be asked to decide is illegal under the anti-kickback statute, the prejudicial effect of that cannot be understated. So, you know, at the very least, we would ask that he be provided a retrial due to the necessity of having granted a mistrial after the introduction. Wasn't there a consent, though, by counsel that it's allowed regarding the state of mind but not the legal opinion? So, once the mistrial was denied, there was... And that was later that same day. Yes, Your Honor, later that same day. You know, I think it's preserved that he thought that counsel was arguing for and didn't waive any rights with respect to the mistrial. There was a jointly proposed limiting instruction that he proposed very soon after that testimony but ultimately was not given until 400 pages of transcript later, which I think was six days. And, you know, I think even though that was agreed, it's not correct that it's relevant to his state of mind. Percanti's state of mind really isn't relevant here at all. So, I think that that was error. But I think the simpler way to look at this is to say this should have been a mistrial rather than a limiting instruction. If there are no further questions at this time, I would ask to reserve the remainder for rebuttal. Thank you.  Thank you. Ms. Ellickson? May I proceed? Yeah. Good morning, and may it please the Court. Jenny Ellickson for the United States. This is a complicated scheme, and so I'd like to step back and just clarify exactly what the referral that occurred was. The referral wasn't the doctors signing the orders. And if the circumstances had been different and they'd been paying the doctors to sign those orders, that would have potentially been the referral at issue. The referral occurred when Anderson and O'Neill, who were procuring these doctors' orders, had the doctors fax the orders directly back to them. And then Anderson and O'Neill, sometimes using Percanti as a go-between, would forward those orders to PsyMed, Sorenson's DME supplier, to have Sorenson effectively be the pharmacy that was filling those prescriptions. That's the decision that was co-opted from the patients, the decision to select the supplier for the braces described in those doctors' orders. As opposed to just the selection of the braces? That's right. So who cares who the distributor is, if you're the doctor or the patient? So by regulation, patients have the right to choose their own DME supplier. It's sort of like you have the right to choose your pharmacy. Your doctor doesn't choose your pharmacy for you. You get to decide which pharmacy is going to fill your prescription. And it's just the way the procedure works. A patient may have a preference and has a right to have a preference about who is going to be supplying that product. Does that mean a manufacturer can't enter into an exclusive distribution agreement? I'm not sure if a specialty pharmacy and a manufacturer agree to do that. But that also isn't the issue here. The issue is the choice of the pharmacy, effectively, the choice of the DME supplier. And they did, in fact, have this exclusivity agreement, which was also probably hidden from patients. But the key is that it seems like the patients didn't even understand that they had a choice because that was concealed from them. Ms. Ellickson, is it correct that if all of the players in this complex scheme you've described, if they were all working for the same company, it would all be perfectly legal, right? That's an interesting question. I'm not sure that it's possible for all the players, that you could be a DME supplier and also be the manufacturer of the products that you're supplying. I'm not entirely sure of exactly how it works. I know that you have to get a Medicare authorization to be a DME supplier. I'm not sure what all the requirements for that would be. Well, let's suppose we're talking about a large integrated medical device company, and there are many, that has its own manufacturing facilities, its own distribution network, and its in-house advertisers and call center for reaching out to doctors. So all these elements are in the same company. That's a crime? Well, what I'm not sure about in your hypo either is that the patients understand that they are opting into this whole system. I think the problem here is that the patients were deprived of the choice of choosing a DME supplier. If it was clear to the patients, if they were kind of told at the front end, you are kind of now agreeing to have this entire apparatus, you are choosing from a marketplace of all of these things, and you are making the choice to choose this provider to give you all of these services, and the patient is making that independent decision, then I'm not sure that would be a problem. Go ahead. Well, I don't want to take a step back. And so that dictate, according to the government, comes from the Medicare regulations. Well, the evidence showed, the jury conferred, that the Medicare expert testified that by regulation, patients have the right to choose their own DME supplier. By regulation and not by legislative history, but by regulation specifically? Yes. And so here it would not be enough if we were to assume the doctors certainly knew, because you can look at this record and say, well, we assume the doctors know because PsyMed is in big black letters in the upper left-hand corner of the pre-filled prescription order. And then the patients have also chosen to work with the advertiser who contacted them and said, let me help you walk through all these steps. So those two independent choices and acknowledgements and awareness, that is not sufficient, according to the government. Well, I'd like to disagree, actually, first of all, with the doctors. There were two different people who were sending orders to doctors. There was Anderson and her team, and there was O'Neill and his team. Anderson's orders, when she sent them, they did have the PsyMed logo at the top, but it didn't identify that PsyMed was the DME supplier. It didn't say, you know, by signing this order you were agreeing that PsyMed should be the DME supplier. It just was a letterhead at the top of the order. O'Neill's orders had no reference to PsyMed at all. There was nothing on the order that would indicate that the doctor was aware who the DME supplier would be. So with respect to O'Neill, I think there was no kind of notice given to the doctors, much less agreement. But even if you think that the PsyMed notice was sufficient to put the doctors on notice, that PsyMed was the DME supplier sending it, that's still steering the doctors to, you know, if you think that the doctors by signing the order are choosing PsyMed, you're steering the doctors. Well, you're steering some of them, right? And many of them don't respond, right? Yes. Well, I think the key is that the doctors were – I think a reasonable jury could infer that the 80 percent of doctors who weren't signing the orders didn't sign them because they didn't think the braces were medically necessary and not because they disagreed with the idea that PsyMed would be the DME supplier. I don't think there's anything in the record that suggests that any doctor ever selected a different DME supplier, even if the doctors had the right to do so. I think the evidence allowed the jury to find the patients should make that decision, not the doctors. But there was no – But doesn't that 20 percent cut against your argument that the prescriptions – or that the marketing companies had or exercised some type of informal power control? No, Your Honor, because I think the jury could infer that they may not have been able to control the doctors deciding that the patients had a medical need for the braces, that 80 percent of the doctors might have found no medical need. But with respect to the DME supplier, signing the orders did not – was not a sign-off by the doctors and the DME supplier. Actually, how does the government know that? How does the government know that for the 80 percent, their reasons were no medical need versus some of them thinking, well, my patient may need a brace. Let me talk to them, and then I have a different supplier in mind. This is because we're on the sufficiency of the evidence standard, and the inferences have to be drawn in favor of the verdict. This sounds like sheer speculation, not inferences. Well, I think there's no basis – I think the jury could look at these orders and say this is not something where the doctor is authorizing a DME supplier. This is a prescription for a brace. Ms. Ellickson, let me go back to my earlier question to your colleague about a relative handful of cases in which the government is going after payments to parties other than health care providers, people who are making decisions about health care. I gather these are pretty few and far between. I'm not sure I agree with that, Your Honor. I don't have a kind of a comprehensive list, but I think it's – I personally worked on cases that are not cited in the briefs where there have been kickbacks paid to, for example, patient recruiters who kind of go out on the streets to try to find people to go to a provider. And those constitute kickbacks, even though that person has no connection to the medical industry. So I guess I've got a couple of fundamental questions here. One, I'm trying to understand the harm to the government here from this scheme, and I'm trying to understand how far you think this goes and how one would distinguish between marketing, advertising that are perfectly legal, and pretty similar conduct that sends somebody to federal prison for several years. So to take the first question first, I think the anti-kickback statute is kind of motivated by two principal concerns. One is protecting patient choice, and two is making sure that health care providers and service providers are not offering and providing services that are not actually needed because that's a waste of money. And so here, you have a circumstance where we know from the record that PsyMed was overcharging Medicare for these braces. These braces were— That's a different problem, though, right? Well, no, but if you're looking for the harm, if you are inducing— if you're trying to encourage patients to get these braces and if you're trying to funnel them to a DME supplier that is going to be— There's just a financial— But I think the patient choice really is more the issue here. Can we go back to a point that Judge Jackson-Akumi raised in regards to record evidence? I appreciate that we're here on sufficiency of the evidence. What record evidence do we have that the patients who were contacted by the marketers were directed only to PsyMed? So I can give you a couple of exhibit numbers for that. First, you can look at Government Exhibit 2012 on page 4, I believe it is. This is Anderson's proposal at the beginning of the scheme involving Anderson, where she kind of laid out exactly what was going to happen. You said Exhibit 2012? 2012, Government Exhibit 2012. I'm sorry, this is page 2, I think, of the exhibit. And she kind of has done a write-up explaining to all the other players in the scheme how this is going to work. And she said that when the call center is talking to the customers, she said during this stage we will notify the customer who will be filling their product and get permission to send the prescription to their doctor and for the DME to ship and build a product. And so it's a notification. It's not a saying you have a choice. It's basically saying here is who we use. And then for the O'Neill scheme, you can look at the call script, which is Government Exhibit 118. And in that, in the call script for the braces, as they're going through and talking to the patients about the braces, they say for each of the different braces, near the beginning, they say that you may qualify to receive medical supplies or equipment from one of our contracted suppliers. It doesn't seem to be identified. And then at the end, they say we can contact your doctor to see if he or she would like to send you a new back brace. So that's in Exhibit 118. Sorensen, in his reply, pointed to page 24 of that exhibit, saying that there's additional language that said, where it says there's a consent statement that says, I'm now going to forward your information to DME, our recommended supplier. They will check with your doctor and insurance. Is that okay? I'll say two things about that. First is that that language didn't actually appear in the brace call script. A variation of that language appears in a different part of this call script for diabetic products, which are not at issue in this case. So I think the jury could infer that even that caution was not given to the brace patients. But even if it was given, this is a notification to the patients, basically saying, we're telling you who's going to give you your brace. Is that okay? And that's steering the patients, influencing the patients to use this particular DME supplier. So this is not just kind of marketing and giving people. I think the line that the Fifth Circuit drew for legitimate marketing and advertisement versus improper inducement is, does the patient still have an opportunity to make an independent decision, or has there been undue influence, or has the decision been kind of co-opted by the person who's ostensibly the marketer? And that's, I think, what we have here. Ms. Ellickson, if we were to disagree with you and say this goes too far, tell me what the parade of horribles looks like for the government. Well, I'm not sure exactly what line the court would draw to say that this goes too far, but I think what we have here is a circumstance where this is a scheme where they are trying to hide behind the fact that the initial step of the scheme was posting a website advertisement and saying once you post a website advertisement, you should be considered to be an advertiser or marketer, and anything you do after that, you know, you could be paying people, giving them a check every time they make a referral, and that's still okay because you're still an advertiser or marketer. I mean, that's basically what happened here. But not paying medical care providers or people who control those decisions. They did control the decision in this case. Sorry, who controlled what decision? Anderson and O'Neill and Percanti controlled that decision because the patients did not have a meaningful chance to choose a DME supplier. They were told. In regards to the kickback, is it where for Sorensen is when he pays Percanti and then it's divided out between Anderson and O'Neill, is that? Yeah, so basically Sorensen is the one who's getting all the money in from Medicare, and then he gives the money to Percanti, and Percanti then distributes it to Anderson and O'Neill, and they understood that that's how the payments would be working. So the payment to Percanti is a kickback, and then he also knew that the money going to Percanti was going to be making indirect payments. But put them all in the same enterprise and it's all okay. I know you haven't conceded that, but I'm trying to understand how that would be a crime under your theory. Yeah, as a threshold matter, I'm just not sure that you could be compliant with Medicare and have it all under one umbrella because, again, but the key is the patient choices. And so if the patient is kind of opting in at the beginning and saying, I understand that I have choices in all of these metrics and I'm agreeing, I've decided, I've done my research, I've been advertised to, I want this company to fulfill all of these things for me. That's one thing, but that's not what we had here. The decision was concealed from the patients. I see that I'm out of time. Why the focus at trial and while investigating on the percentage payment structure? So I don't think that the, I mean, I think the percentage payments were certainly a component, but it was not the government's theory at trial that this is a percentage and therefore it's illegal. But the percentages are important because it shows, it helps to show that these payments were not being made for the actual services being provided. It wasn't for, oh, you ran a call center for eight hours and we're paying you for the eight hours you ran the call center. If they're doing it based on the volume of brace products that they were able to supply through the DME supplier, that's how you know that it's a kickback and that the money, at least some of the money is going toward to reward them for referring that quantity of braces and it incentivizes them to make sure that there are more orders still coming in. So we could potentially still prove the case if it weren't a percentage-based payment, but the percentages are how you know it makes it more obvious that this was a kickback. Well, then let me ask you just briefly, how then, you know, we're reviewing O'Neill. Let's assume it's abusive discretion. How does his repeated testimony about the illegality of percentage payment structures not cause the jury to make impermissible inferences? So I think O'Neill actually, he only made one statement, I think, about it's illegal to pay on a percentage. That answer was struck and there was a curative instruction given. I don't understand the defendants actually to have been challenging that part of O'Neill's testimony. They did challenge O'Neill describing the conduct that he committed. And then Percanti had additional statements. But again, the initial statements that Percanti made about his communications with his lawyer, there was arguably a hearsay objection, but there was no other objection to that coming in. But that goes to willfulness. That kind of started the chain that helped to prove that Sorensen knew that what they were doing was illegal. And it was not, you know, the jury received instructions telling them, you know, that the witnesses, to the extent a lay witness provided an opinion on the illegality, you're not to consider that, so that wouldn't have affected the jury. But I know I'm over time. I'm happy to keep answering questions. I'm looking at a question about page 17 of your brief where you reviewed our cases in this area and you conclude that the anti-kickback statute, therefore, imposes criminal penalties on a defendant who pays any person to induce that person to send or direct patients to health care services that the defendant provides. Stated that broadly, it seems like that would include an advertising agency that puts together an ad for the latest new miracle drug or device. Right. I think that the language that this court used in Patel where it says steers a patient to a particular provider, I think that language sort of encapsulates the idea that the patient is actually not making an independent decision. And I think that is, if the court is looking for a line, I think that's the line that the Fifth Circuit has drawn in its cases. The question is whether the advertising is facilitating an independent decision by the patient or has it crossed the line into undue influence? And just to kind of walk through, in our case, I think here, the website advertisements, that may well be on the kind of permissible advertising side of the line. I would hope. Once they start making direct calls to individual patients, I think that gets closer to undue influence because you're putting individual pressure on patients. I think the Fifth Circuit talked about this in its Shoemaker decision, that this is kind of analogous to the line that you have with attorneys for how they can advertise their business, that once you start having direct reach-outs, it's a concern. But the real, I think, the definite line was crossed, and the issue we have here is when the Anderson and O'Neill's people co-opted the decision. And it wasn't just that they were kind of talking to the patients directly. It was that they basically said, here's who we're going to have fill your brace product without giving the patients kind of a meaningful opportunity to make a different decision. And so that's the line for us. If I'm following you, then what you're saying is that if a manufacturer of a device or drug has an exclusive distribution agreement with one DME, as you put it, or network, that's going to result in people committing felonies. No, I'm not sure that I'm saying that. But the key is that the patient needs to know that they have an option, that they don't have to go to that DME supplier. If you want this back brace, you don't have an option with the exclusive deal, right? Well, I'm not sure that this was the only DME supplier that could give you that back brace. I'm hypothesizing a little bit, but I'm trying to understand how far your arguments are going. Yes, I think for this, I think that the patient has to kind of go in with open eyes and make an independent choice. And if the patient kind of knows that they have options and understands through the advertising what they're getting. And so when O'Neill or Anderson say, and here's our recommended supplier, is that okay? That's not good enough. I think basically the way this seems to have unfolded is it seems like if I were the patient calling, and I think the jury could infer this, I would think, well, if I want this back brace, this is who has to give it to me. It has to be coming from. We haven't engaged with the hypothetical that Judge Hamilton presented, however, in regards to if there is an exclusive, how far does your argument go? Yes, and again, this is not a hypothetical that I kind of have. But I think if you are choosing a DME supplier and you say, well, I really want this one back brace and I can only get this one back brace from this DME supplier, then potentially in that case you would be making an independent choice. But I'm not sure in this case. It didn't seem like they were actually advertising a specific back brace. They certainly weren't advertising the DME suppliers saying, hey, patients, here are all the reasons why this DME supplier is. You would care, right? Well, you know, the patients have a right to have the choice. So anyway, I know I'm over time. I'm happy to answer additional questions if the court is inclined. But I appreciate the court's indulgence. Thank you. We ask the court to affirm. Yeah. Okay, Ms. Kucinich, we asked you a question at the very end when you were going into your rebuttal time, so we'll give you two minutes. Thank you, Your Honor. Lots to cover, so I appreciate it. I want to start with the government's distancing of itself from this percentage-based theory. It may be doing that on appeal. It did not in the district court. So the rebuttal in Mr. Sorensen's trial was heavily focused on the percentage-based nature of the compensation. I'd point the court to 1493 to 1497 of the transcript. And then, very importantly, O'Neill was sentenced since we filed our opening brief in this case a few months ago. The case number in which O'Neill was charged is 20CR371. At the sentencing, the judge asked the government, the whole apparatus, meaning what we're talking about here, would have been okay if he was compensated for it. If he was paid by the hour for doing this, it would have been fine, right? And the government's attorney responded, right. So it is just incorrect that this percentage-based theory is not the core of what the government's concern is, and it demonstrates that it elevates form over substance. This goes to Judge Hamilton's point that had this all been one company, had the DME supply been done as part of the manufacturer's business rather than outsourced, or had the marketing been taken in-house by PsyMed, there would have been no problem. It is an example of the actual conduct and the contact between the marketers and the supplier and the manufacturer and the patient and the doctor is not actually substantively improper, but according to the government, as soon as you outsource, which companies should be perfectly able to do, it becomes a felony violation. That makes no sense. It has no limiting principle, and we would ask that this court reject it for that reason. I want to address very quickly the government's reference to other cases in which this occurs. We are aware of no other case in which the marketing function was as it was here, meaning there was a call center that wasn't responsible for allocating. So I point your honors to the second part of Marchetti, which the government claims is like this case. It's not. In that second part of Marchetti where the Fifth Circuit upheld the conviction, what was happening was that the call center or the marketer in that situation was following leads for patients. They then allocated those leads depending on who paid, and that is the case in all of the call center and marketing cases of which I am aware, where either there was a doctor being paid because the doctor was being compensated improperly by the call center, or the call center puts itself in the position of actually making a decision about where those leads go, and nothing of the sort happened here, at least according to the trial record as it existed in Mr. Sorenson's case. At the very least, all of this reflects that he could not have acted willfully. All of these muddy waters and the confusion about where these boundaries are makes it impossible for Mr. Sorenson to have known that his conduct was illegal. So we would ask that the court vacate his conviction. And if there are no other questions, I would thank the court for its time. All right. Well, thank you to Ms. Kucinich and Ms. Ellison. We will take the case under advisement.